IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


AMY MCFALLS                              :
                                         :        CIVIL ACTION
                 v.                      :
                                         :        NO. 18-2871
BRIGHTVIEW LANDSCAPES, LLC,              :
ET AL.                                   :

**<u>MEMORANDUM</u>**


**SURRICK, J.**                                              **APRIL 21, 2020**

Presently before the Court in this employment discrimination action is Defendants'

Motion for Summary Judgment.  (ECF No. 17.)  For the following reasons, Defendants' Motion

will be granted.

**I.      BACKGROUND**

BrightView is a landscape services provider.  (Declaration of Aurelina Rojas-Chaljub

("Rojas-Chaljub Decl.") ¶ 2, ECF No. 17-3 Ex. A.)  On October 25, 2016, BrightView offered

Plaintiff a position as a senior contracts administrator.  She began work on November 8, 2016.

(May 29, 2019 Deposition of Plaintiff ("Pl. Dep.") at 103-04, Ex. C to ECF No. 17-3, ECF No.

19-3; Offer Letter, Ex. D to ECF No. 17-3.)  As senior contracts administrator, Plaintiff was

responsible for the negotiation, preparation, and execution of various BrightView contracts.  (Pl.

Dep. at 71, 105-06.)  Plaintiff reported to Defendant Susan DeSantis, senior director of

operations.  (June 17, 2019 Deposition of Susan DeSantis ("DeSantis Dep.") at 15, 89, Ex. F to

ECF No. 17-3.)

In April 2017, Plaintiff contacted human resources manager Aurelina Rojas-Chaljub to

discuss some concerns with DeSantis.  (Pl. Dep. at 141-42; July 2, 2019 Deposition of Aurelina

Rojas-Chaljub ("Rojas-Chaljub Dep.") at 18, Ex. I to ECF No. 17-3.)  Plaintiff and Rojas-

Chaljub met in person on April 13, 2017.  (Rojas-Chaljub Dep. at 35-36; Pl. Dep. at 201.)

During the meeting, Plaintiff discussed her belief that DeSantis was treating her differently from

other employees because Plaintiff was a woman.  (Pl. Dep. at 143.)  She alleged specifically that

DeSantis:  was keeping work from Plaintiff or instructing other employees to do so; was directing

other employees not to help Plaintiff with her work; told Plaintiff that "women are more

emotional"; and told Plaintiff that she let people "walk over her."  (Rojas-Chaljub Dep. at 36-39.)

Rojas-Chaljub did not personally investigate these issues, but she referred them to her supervisor,

Jeannie Thorne, a senior human resources business partner.  (*Id.* at 19, 36-39.)

Four days after the meeting, on April 17, 2017, Plaintiff sent Rojas-Chaljub a follow-up

email in which she made additional allegations against DeSantis:

> I am enclosing further evidence of Susan DeSantis' harassment of me.  She is
> now alleging complaints are being made about my work; suddenly, after 5 months
> of employment here.  However, she cannot provide the specific complaints; no
> actual examples are given to me even after I repeatedly request them.
>
> I was able to speak with another former employee this weekend, Leslie Walsh.
> She stated she had also complained about receiving unfair, poor treatment by Ms.
> DeSantis.  She informed me that Ms. DeSantis sabotaged her work, as she has
> done to me in the past by taking work emails out of the communal inbox and
> putting them into another folder where luckily, I found them by chance.  Also, as I
> mentioned on Thursday, Ms. DeSantis told Wanda Tse to take my executions (we
> perform a process in the E1 system for fully executed agreements) and to not tell
> me.  When Ms. Tse did tell me, and I asked Ms. DeSantis about it, Ms. Tse
> received an angry phone call because she had told me.  Ms. Walsh (the former
> employee) also informed me that Ms. DeSantis has also alleged complaints were
> being received about Ms. Walsh, but upon further investigation with the people
> supposed to be making such complaints, it was discovered that Ms. DeSantis'
> allegations were untrue.  I have all of Ms. Walsh's conversation in text messages.

(Ex. Q to ECF No. 17-3.)  That same day, Thorne reached out to Plaintiff via email to set up a

time to talk.  (Ex. S to ECF No. 17-3.)  Plaintiff and Thorne met in person on April 19, 2017.

During the meeting, Plaintiff reiterated the same allegations that she made to Rojas-Chaljub.  She

also alleged that she was being "overloaded" with work and that DeSantis used a different tone

of voice with men, i.e., she "flirted" with them and "talked like a baby like she was being like

cute around them."  (Pl. Dep. at 150-52.)  Plaintiff also alleged that DeSantis required her to do

certain administrative tasks, but did not require Plaintiff's male counterparts to do that type of

work.  (*Id*. at 73, 108-09, 173.)  At some point after this meeting, Thorne informed Plaintiff that

she had investigated her allegations about DeSantis and found them to be unsubstantiated.  (*Id*. at

203-04; Rojas-Chaljub Dep. at 54.)

Meanwhile, DeSantis scheduled a telephonic "six-month check-in" with Plaintiff for

April 26, 2017.  (DeSantis Dep. at 81.)  DeSantis, Plaintiff, Thorne, and one other employee

were on the call.  According to DeSantis, Plaintiff was combative and would not let her speak.

DeSantis ended up excusing herself from the call.   (*Id*. at 82-84; Pl. Dep. at 169, 174.)

According to Plaintiff's recollection of the call, Plaintiff asked why DeSantis had waited several

weeks to advise her that she "noticed a change" in Plaintiff's work, and DeSantis was unable to

answer the question.  (Pl. Dep. at 169-70.)  Plaintiff also recalls that DeSantis "cried" upon

leaving the call.  (*Id*. at 169, 174.)

Unsatisfied with the results of Thorne's investigation, Plaintiff called Defendant Amanda

Orders, senior vice president of human resources, on April 27, 2017.  (Pl. Dep. at 203; June 26,

2019 Deposition of Amanda Orders ("Orders Dep.") at 11, 37-38, Ex. H to ECF No. 17-3; Ex. U

to ECF No. 17-3.)  Orders returned Plaintiff's call, but did not reach her, so she sent a follow-up

email to Plaintiff attempting to set up a call.  Plaintiff responded to Orders' email advising that

she raised her concerns regarding sex discrimination with Rojas-Chaljub and Thorne.  She also

alleged that "[i]nstead of [Thorne] addressing the matter, she has attacked me," by:

- Telling Plaintiff that she has "the potential to become aggressive";

- Telling Plaintiff that she cannot not possibly be keeping up with her work because "stressed people do not work well";

- Suggesting that Plaintiff fabricated her allegations against DeSantis based on her discussions with former employees; and

- Telling Plaintiff that she is "angry" and "refuses" to accept Thorne's help.

(Ex. U to ECF No. 17-3.)  Plaintiff also alleged that Thorne failed to address her concerns with DeSantis.  (*Id.*)  In addition, she suggested that human resources was complicit in DeSantis's discriminatory behavior.  (*Id.*)

On May 1, 2017, Orders, Rojas-Chaljub, and BrightView's chief legal officer, Jonathan Gottsegen ("Gottsegen") met with Plaintiff to discuss these issues further and obtain additional information from Plaintiff.  (Pl. Dep. at 207; Orders Dep. at 28-29, 40-41; Rojas-Chaljub Dep. at 45-46.)  At the meeting, Plaintiff repeated her allegations regarding DeSantis.  (Orders Dep. at 41-42; Pl. Dep. at 208-09.)  Rojas-Chaljub asked Plaintiff if she would be willing to address her concerns with DeSantis, to which Plaintiff responded that she would.  (Rojas-Chaljub Dep. at 46-47.)

On May 4, 2017, Plaintiff emailed Orders, Rojas-Chaljub, and Gottsegen a list of seven former female employees who experienced similar problems with DeSantis.  (Orders Dep. at 45-46; Ex. U to ECF No. 17-3.)  On May 10, 2017, as part of their investigation into Plaintiff's allegations, Orders and Rojas-Chaljub met with Wanda Tse ("Tse"), another employee who worked for DeSantis.  (Orders Dep. at 31-32; Ex. V to ECF No. 17-3.)  The minutes for this meeting indicate that Tse previously had difficulty working with DeSantis and that according to Tse, DeSantis could be "abrupt" and "[m]any employees ha[d] left because of the stress

4

[DeSantis] put them under." (Ex. V to ECF No. 17-3.) Tse also stated that although DeSantis "has not changed," she had "adapted" to DeSantis's "style" of management. (*Id*.) Tse believed that DeSantis "need[ed] to change" and that her "approach [was] an issue for others in the department." (*Id*.) She did "not feel that [DeSantis] [had] been officially addressed" regarding the complaints about her management style. (*Id*.) Tse did not mention anything about discrimination, whether sex-based or otherwise. (*See id*.)

On May 18, 2017, Orders and Rojas-Chaljub met with Plaintiff to discuss their investigation. (Rojas-Chaljub Decl. ¶ 18; Plaintiff Dep. at 156-57.) They informed her that they did not believe DeSantis was treating her inappropriately or that work was being unfairly distributed. (Rojas-Chaljub Decl. ¶ 19.) Plaintiff was unhappy with these results and believed that they were "fake." (Pl. Dep. at 158.) When asked at her deposition to explain what she meant by "fake," Plaintiff testified that DeSantis had a "history" of mistreating employees and the fact that there were no written records of her prior misconduct indicated that BrightView had "destroyed" those records. (*Id*.) Plaintiff agreed to attend a follow-up meeting with Orders, Rojas-Chaljub, and DeSantis on May 31, 2017. (Rojas-Chaljub Decl. ¶ 20; Ex. W to ECF No. 17-3.)

In the meantime, Orders and Rojas-Chaljub learned that Plaintiff may have been using company time to inquire of others about DeSantis. They advised Plaintiff via email on May 23, 2017 that any such conduct was an inappropriate use of company time. (Ex. X to ECF No. 17-3.) In response, Plaintiff asked them to "advise what [they were] referring to" and to "[p]lease stop attacking me." (*Id*.) She also asked them to define "company time" and explained that there were no "court orders stopping" her from speaking with other employees, which she had a "right" to do. (*Id*.) Later that day, Plaintiff forwarded this email chain from her work email to

her personal email account, and from there to her attorneys.  (*See id*.)

On May 31, 2017, Plaintiff met in person with DeSantis and Rojas-Chaljub, as planned.

Orders joined by phone.  (Orders Dep. at 63-64; Pl. Dep. at 27-28; DeSantis Dep. at 115.)[1]

According to DeSantis, Plaintiff was combative and would not let her speak, so DeSantis

eventually left the meeting.  (DeSantis Dep. at 116-18.)  According to Plaintiff's recollection of

the call, she asked DeSantis why her workload was so much heavier than her male colleagues

and confronted DeSantis about her allegedly false accusations that other employees were

complaining about her work.  Plaintiff also testified that DeSantis "could not back up her

statements" and that the meeting ended when DeSantis left "crying."  (*Id*. at 35-36.)  According

to Rojas-Chaljub, after DeSantis left the room, Orders

> was trying to talk to [Plaintiff] about … needing to hear [DeSantis] out and her
> being able to get her concerns forward so that [they] could reach an agreement
> and find a way to move forward with the issues at that time.  That's when
> [Plaintiff] wasn't very happy with [Orders] approach.  She kept interrupting her,
> and [Orders kept asking her to hear her out.  And, in turn, [Plaintiff] flipped
> [Orders] through the phone and walked out of the room.

(Rojas-Chaljub Dep. at 63; *see also* Orders Dep. at 65.)  When asked to explain what she meant

by "flipped," Rojas-Chaljub testified that Plaintiff "pointed her middle finger at the phone as

[Orders] was talking."  (Rojas-Chaljub Dep. at 63.)  Plaintiff denied that she gave the middle

finger to anyone during that meeting.  (Pl. Dep. at 28.)

After Plaintiff left the May 31, 2017 meeting, Rojas-Chaljub informed Orders that

Plaintiff had given her the finger.  (Orders Dep. at 65.)  Although the precise order of subsequent

events is not clear, Rojas-Chaljub and Orders advised Sarah Powenski ("Powenski"),

---

[1]      There appears to be a dispute over whether DeSantis was present by phone or in person.
According to Plaintiff, DeSantis joined by phone.  According to Orders and DeSantis, DeSantis
attended in person.  The dispute is not germane to this Motion.

BrightView's associate general counsel, about Plaintiff's conduct.  (*Id*. at 59, 68.)  Later that day, Powenski told Plaintiff that she "needed to go home, that [she] was not fired, [she] was not suspended, but [she] [would] receive a phone call when [she] [would] need to return to work." (Pl. Dep. at 32.)  Orders and Powenski discussed the incident and decided to terminate Plaintiff for "inappropriate behavior" and "unacceptable leadership."  (Rojas-Chaljub Dep. at 68; Orders Dep. at 66-70.)  The middle finger incident was the "sole reason for the termination."  (Orders Dep. at 70.)  No one else at BrightView, including Rojas-Chaljub, was involved in the decision to terminate Plaintiff.  (*Id*. at 66, 69; Rojas-Chaljub Dep. at 68.)

Powenski called Plaintiff that day and told her she was being terminated for "unprofessional conduct" and making a "gesture."  (Pl. Dep. at 27-29.)  Plaintiff asked Powenski "how [she] could make a hand gesture to somebody on the telephone."  (*Id*. at 29-30.)  Plaintiff also believes that Rojas-Chaljub was "lying" about Plaintiff giving the middle finger to Orders because Rojas-Chaljub "was trying to protect her job."  (*Id*. at 30.)  When asked at her deposition to explain how lying in this situation could protect Rojas-Chaljub's job, Plaintiff "guessed" that if Rojas-Chaljub "[said] that about [her] since [Orders and DeSantis] were against [Plaintiff] and they were looking for a reason to terminate [her] and [Rojas-Chaljub] fabricates that, then there was their so-called reason."  (*Id*. at 30-31.)

Plaintiff acknowledges that Powenski was "only involved at the end" and does not believe that Powenski treated her differently because of her sex.  (Pl. Dep. at 42.)  She believes it was "possible" Orders discriminated against her on the basis of sex, by failing to take appropriate action against DeSantis.  (*Id*. at 23-25.)  According to Plaintiff, if Orders "hadn't discriminated against [Plaintiff] because of her gender, then she would have taken action" against DeSantis. (*Id*. at 25.)

7

On July 9, 2018, Plaintiff filed her Complaint in this action, alleging:  (1) sex discrimination, in violation of Title VII (Count One); (2) retaliation, also in violation of Title VII (Count Two); and (3) sex discrimination, in violation of the Equal Pay Act ("EPA").  (ECF No. 1.)  She has since withdrawn her claim under the EPA.  (*See* Pl. Br. at 3 n.1, ECF No. 19-1.) Defendants filed a Motion for Summary Judgment on August 1, 2019.  (ECF No. 17.)  Plaintiff filed a Response in Opposition on September 3, 2019 (ECF No. 19), and Defendants filed a Reply on September 13, 2019.  (ECF No. 20.)[2]

## II.     DISCUSSION

### A.     Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When making this determination, we must weigh all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018).  "For its part, '[t]he non-moving party must oppose the motion and, in doing so, may not rest upon the mere allegations or denials of his pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'"  *Id.* at 288-89 (quoting *D.E. v. Central Dauphin Sch. Dist.*, 765 F.3d 260, 268-69 (3d Cir. 2014)).  "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for

---

[2]     Based on Plaintiff's opposition papers, she appears to have abandoned her allegations of pay discrimination as they relate to her Title VII claims.  Accordingly, we have not addressed the evidence related to unequal pay.  *See Seals v. City of Lancaster*, 553 F. Supp. 2d 427, 432 (E.D. Pa. 2008) (concluding that the "plaintiff's failure to mention [certain] issues in her summary judgment response constitutes abandonment of those claims") (collecting cases).

the nonmoving party.'"  *Id.* at 289 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)).  "Conversely, 'where a non-moving party fails sufficiently to establish the existence of

an essential element of its case on which it bears the burden of proof at trial, there is not a

genuine dispute with respect to a material fact and thus the moving party is entitled to judgment

as a matter of law.'"  *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (quoting

*Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)).

 **B.** **Plaintiff's Claims against DeSantis and Orders in Their Individual Capacities Will Be Dismissed**

  Plaintiff's Title VII claims apply to DeSantis and Orders in their "individual" capacities.

(*See* Compl.)  However, as Defendants note, "Title VII does not provide for individual liability."

*Newsome v. Admin. Office of the Courts of the State of New Jersey*, 51 F. App'x 76, 79 n.1 (3d

Cir. 2002) (citing *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1078 (3d Cir.

1996) (en banc)); *see also Ciferni v. Boilermakers Local 13*, 158 F. Supp. 3d 263, 268 (E.D. Pa.

2016) (concluding that "the individual defendants are not amenable to suit under Title VII" and

"dismiss[ing] the Title VII claims against the individual defendants with prejudice").  Moreover,

Plaintiff has not responded to Defendants' arguments on this point and she has therefore

abandoned her claims against the individual Defendants.  *See Seals*, 553 F. Supp. 2d at 432.  For

these reasons, we dismiss Plaintiff's claims as they relate to DeSantis and Orders individually.

 **C.** **Plaintiff's Discrimination Claim Will Be Dismissed**

  *1.* *Relevant Legal Framework*

  To establish a *prima facie* case of sex discrimination under Title VII, Plaintiff must show

that: "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought

to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred

under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008); *see also Jones v. SEPTA*, 796 F.3d 323, 327 (3d Cir. 2015). "To establish a prima facie case at summary judgment, 'the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case.'" *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (quoting *Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001)). "If a plaintiff fails to raise a genuine dispute of material fact as to any of the elements of the prima facie case, she has not met her initial burden, and summary judgment is properly granted for the defendant." *Id.*

If the plaintiff establishes a *prima facie* case, however, "'the burden of production [then] shifts to the defendant to offer a legitimate non-discriminatory [justification] for the adverse employment action.'" *Id.* (quoting *Smith v. City of Allentown*, 589 F.3d 684, (3d Cir. 2009)). "This burden is 'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Id.* (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). "At this stage, 'the defendant need not prove that the articulated reason actually motivated its conduct.'" *Id.* (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)). If the defendant satisfies its burden, the plaintiff must then "provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d Cir. 1994)).

2.      *The Alleged Adverse Employment Actions against Plaintiff* [3]

Turning to Plaintiff's *prima facie* case, Plaintiff alleges the following adverse

employment actions:  uneven workload imposed by DeSantis; performance criticisms by

DeSantis; discriminatory comments by DeSantis; deliberately inadequate investigation into

DeSantis's conduct by human resources; and termination.  The parties agree that "[t]ermination

of employment constitutes 'adverse employment action' for purposes of Title VII."  *See Storey v.*

*Burns Int'l Security Servs.*, 390 F.3d 760, 766 (3d Cir. 2004) (Scirica, J., concurring) (quoting

*Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001)).  They

disagree, however, as to whether the remaining actions about which Plaintiff complains are

actionable under Title VII.

Typically, an adverse employment action under Title VII is "an action by an employer

that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or

privileges of employment.'"  *Storey*, 390 F.3d at 764 (quoting *Cardenas v. Massey*, 269 F.3d 251,

263 (3d Cir. 2001)); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (holding

that "[a] tangible employment action constitutes a significant change in employment status, such

as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits").  "Thus, while a discharge or a refusal to hire

---

[3]      Because Defendants appear to concede the first, second, and fourth elements of the *prima facie* case, we address only the third element, whether there was an adverse employment action. Since "the *prima facie* case and pretext inquiries often overlap," *see Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008), some defendants may choose to focus more on the pretext analysis than the *prima facie* case when moving for summary judgment.  *See also id.* (recognizing that "evidence supporting the prima facie case is often helpful in the pretext stage"); *Rorke v. Toyota*, 399 F. Supp. 3d 258, 277 (M.D. Pa. 2019) ("Because 'the prima facie case and pretext inquiries often overlap; [ ] the court may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext if the defendant offers a nondiscriminatory

would be actionable adverse employment actions, 'when one goes beyond that, the conduct must be serious and tangible enough to materially alter an employee's terms and conditions of employment or adversely affect her status as an employee.'" *Cortes v. Univ. of Medicine & Dentistry of new Jersey*, 391 F. Supp. 2d 298, 312 (D.N.J. 2005) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997), *abrogated on other grounds by Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).  Accordingly, "'not everything that makes an employee unhappy' qualifies as [a materially adverse employment action], for otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis for a discrimination suit.'" *Lake v. AK Steel Corp.*, No. 03-517, 2006 WL 1158610, at *33 n.17 (W.D. Pa. May 1, 2006) (quoting *Robinson*, 120 F.3d at 1300).

       With respect to Plaintiff's complaints about her workload, the record does not support a finding that the alleged inequities were "serious and tangible enough to alter [Plaintiff's] compensation, terms, conditions, or privileges of employment.'" *See Storey*, 390 F.3d at 764.  It is not clear whether and to what extent the additional duties imposed on Plaintiff actually affected Plaintiff's workload, and there is no evidence that the additional work had any adverse effect on her status as an employee.  Plaintiff asserts that the additional workload "caused [her] substantial stress and anxiety," which in turn exacerbated her fibromyalgia.  (*See* Declaration of Plaintiff ("Pl. Decl.") ¶¶ 5 & 6, ECF No. 19-4.)  However, the Third Circuit has rejected the notion that a plaintiff's stress and anxiety automatically establish the existence of an adverse employment action.  *See Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 787 n.5 (3d Cir. 1998)

---

explanation for its employment decision.'" (quoting *Leong v. SAP Am., Inc.*, 67 F. Supp. 3d 972, 980 n.9 (N.D. Ill. 2014))).

(declining to recognize a "per se rule that if a person suffers 'tangible psychological injury,' the employer must have engaged in 'adverse employment action'")."

DeSantis's criticisms of Plaintiff also do not constitute adverse employment action. "[C]ourts in this Circuit find actions such as performance improvement plans, negative reviews, verbal reprimands, and 'write-ups' do not constitute adverse employment actions under Title VII without some change to pay, benefits or employment status."  *See Leftwich v. Lew*, No. 15-300, 2015 WL 8773274, at *7 (E.D. Pa. Dec. 14, 2015) (collecting cases), *aff'd*, 741 F. App'x 879 (3d Cir. 2018); *Blake v. Penn State Univ. Greater Allegheny Campus*, No. 09-1182, 2011 WL 841374, at *9 (W.D. Pa. Mar. 8, 2011) ("[Plaintiff] argues that she was subject to monthly disciplinary conferences when she had not violated any rules, that [her supervisor] berated her in front of co-workers based upon insignificant or non-existent grounds, she was burdened with harsh work assignments and that [her supervisor] overly monitored her work and whereabouts. Such actions, even if supported by the record, are not sufficiently adverse to meet [Plaintiff's] burden under Title VII." (internal citation omitted)).[4]  Moreover, Plaintiff has failed to demonstrate that DeSantis's comments had any bearing on Plaintiff's status as an employee or were otherwise anything more than negative feedback.  She contends that DeSantis's criticisms and scrutiny caused her significant stress, but, as we have explained, that does not establish a cognizable adverse employment action under Title VII.

We reach the same conclusion with respect to DeSantis's discriminatory comments. Although we acknowledge that DeSantis made at least two comments to Plaintiff that were arguably based on gender stereotypes and otherwise inappropriate, "the Third Circuit has held

---

[4]      *Blake* also supports our conclusion that Plaintiff's increased workload was not an adverse employment action.

that 'unnecessary derogatory comments' do not rise to the level of 'adverse employment actions.'" *Middleton v. Deblasis*, 844 F. Supp. 2d 556, 566 (E.D. Pa. 2011) (quoting *Robinson*, 120 F.3d at 1301); *see also Fischer v. Pepper Hamilton LLP*, No. 15-2413, 2016 WL 362507, at *16 (E.D. Pa. Jan. 29, 2016); *Rosati v. Colello*, 94 F. Supp. 3d 704, 714 (E.D. Pa. 2015). "This is because such comments do not implicate 'the employee's compensation, terms, conditions, or privileges of employment, deprive[] him or her of employment opportunities, or adversely affect[] his or her status as an employee.'" *Middleton*, 844 F. Supp. 2d at 566 (quoting *Robinson*, 120 F.3d at 1300).

Finally, we consider the allegedly inadequate investigation of DeSantis's conduct. The Third Circuit appears to leave open the possibility of bringing a discrimination claim on the basis of an employer's inadequate investigation if the plaintiff can show that the allegedly deficient investigation "'effect[ed] a material change in the terms or conditions of [the plaintiff's] employment.'" *See Hare v. Potter*, 220 F. App'x 120, 134 (3d Cir. 2007) (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001), *overruled in part on other grounds by Burlington Northern*, 548 U.S. 53). The case of *Kuhn v. United Airlines*, 63 F. Supp. 3d 796 (N.D. Ill. 2014), *aff'd*, 640 F. App'x 534 (7th Cir. 2016), is instructive. In *Kuhn*, the court recognized that an employer's "failure to adequately investigate a complaint" by an employee "could, under appropriate circumstances, qualify as an adverse employment action." *Id*. at 803 (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006)). We generally agree with this proposition. However, not every employee who is displeased with the result of a workplace investigation has a cognizable discrimination claim. We conclude, as the court in *Kuhn* appeared to suggest, that there must be certain limitations on such claims. For example, the issue complained of, if left uncorrected, must "'be of enough significance to qualify as an adverse

action.'"  *See id*. at 803-04 (quoting *Baird v. Gotbaum*, 662 F.3d 1246, 1249 (D.C. Cir. 2011))

(treating with skepticism plaintiff's claim that defendant "failed to fully investigate what can be

deemed run-of-the-mill harassment or mistreatment complaints"); *see also Scott v. Sunoco

Logistics Partners, LP*, 918 F. Supp. 2d 344, 356 (E.D. Pa. 2013) ("'a failure to investigate a

complaint, unless it leads to demonstrable harm, leaves an employee no worse off than before the

complaint was filed'" (quoting *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 640 (10th Cir.

2012))).  Moreover, an employee should not be able to pursue a discrimination claim on the basis

of an employer's allegedly inadequate investigation when the employer has engaged in a good-

faith investigation.  *See Clemmer v. Office of Chief Judge*, No. 06-3361, 2008 WL 5100859, at

*15 (N.D. Ill. Dec. 2, 2008) ("[Plaintiff] may have preferred her employer to do more in its

investigation, but its failure to conduct an inquiry to her satisfaction does not constitute an

adverse action.").

        Here, Plaintiff contends that Defendants' failure to engage in an adequate investigation of

her claims ultimately led to her termination.  We note in this regard that Defendants engaged in at

least two investigations of Plaintiff's complaints, the second of which was done in response to

Plaintiff's dissatisfaction with the first.  We also note that Defendants afforded Plaintiff the time

and services of at least three human resources officers.  The results of Defendants' investigations

may not have been to Plaintiff's liking, and Plaintiff may have gone about the investigation

differently if she were conducting it, but those cannot be the relevant standards.  Discrimination

claims may not proceed solely on the basis of dissatisfaction with human resources.  We

conclude that the deficiencies in Defendants' investigations, if any, do not constitute an adverse

employment action.

       3.       *Defendants Have Proffered a Legitimate, Non-Discriminatory Reason for Plaintiff's Termination, and Plaintiff Cannot Show That It Was Pretextual*

We are left with Plaintiff's termination as the only adverse employment action that is actionable under Title VII.  Because Defendants concede the *prima facie* case with respect to Plaintiff's termination, we move to the next step of the burden-shifting framework and determine whether Defendants have offered a legitimate, non-discriminatory reason for Plaintiff's termination.  *See Burton*, 707 F.3d at 426.  Defendants meet this "relatively light" burden on the basis of Plaintiff's middle finger gesture.  *See Magnusson v. The Hartford*, 258 F. App'x 444, 446 (3d Cir. 2007) (finding that an employee's use of profanity can serve as a non-discriminatory justification for termination); *accord Peters v. Goodwill*, No. 14-1324, 2016 WL 147067, at *6 (E.D. Mo. Jan. 13, 2016); *Gossard v. JP Morgan Chase & Co.*, 612 F. Supp. 2d 1242, 1251 (S.D. Fla. 2009), *aff'd*, 389 F. App'x 936 (11th Cir. 2010).  Furthermore, Plaintiff does not appear to dispute that Defendant can meet this burden.  Therefore, the final question is whether Defendants' justification for terminating Plaintiff is pretextual.

"To make a showing of pretext, 'the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  *Burton*, 707 F.3d at 427 (quoting *Fuentes*, 32 F.3d at 764).  With regard to the first option, Plaintiff denies engaging in the conduct that got her fired.  Moreover, other than Plaintiff and Rojas-Chaljub, whose respective recitations of events differ, no one else was in the room where it happened.  In this type of he-said-she-said case, where credibility is paramount, the plaintiff must "bring forth evidence that [the employer] did not have an honest belief that [the plaintiff] engaged in

16

misconduct justifying termination." *See Frymoyer v. East Penn Mfg. Co., Inc.*, 757 F. App'x 97, 101 (3d Cir. 2018) (citing *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 152 (3d Cir. 2017)).  In other words, the plaintiff must show that the employer's "explanation was dishonest due to 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions from which a reasonable juror could conclude that the Defendants' explanation is unworthy of credence, and hence infer that the employer did not act for the asserted [legitimate] reasons.'" *Id.* (quoting *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 262 (3d Cir. 2017)); *accord Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 772 (7th Cir. 2002) ("We have previously noted that pretext requires more than a showing that the business decision was mistaken, ill considered or foolish, and have held that so long as the employer honestly believed the reason given for the action, pretext has not been shown." (internal quotations omitted)); *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995).

For several reasons, we conclude that Plaintiff has failed to establish that Defendants did not have an honest belief that Plaintiff made an inappropriate gesture justifying her termination. First, we cannot discern from the record any indication that Rojas-Chaljub had a reason to fabricate her report.  Plaintiff surmised at her deposition that Rojas-Chaljub lied about the incident to protect her job.  Plaintiff's testimony in this regard is speculative, without support in the record, and insufficient to raise a genuine issue of material fact on this issue.  *See Lexington Ins. Co. v. Western Pennsylvania Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005) (holding that "'[s]peculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment'" (emphasis in original) (quoting *Hedberg v. Indiana Bell. Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995))).  Moreover, Rojas-Chaljub was not involved in the decision to terminate.

17

Second, even if Rojas-Chaljub lied or was mistaken, the critical question is whether the decisionmakers, not Rojas-Chaljub, were motivated by discriminatory animus.  *See Jones v. Hosp. of Univ. of Pennsylvania*, No. 03-4938, 2004 WL 1773725, at \*4 (E.D. Pa. Aug. 5, 2004) (collecting cases).  Orders and Powenski, who were the only two involved in the decision to terminate Plaintiff, contemplated disciplinary action only after Rojas-Chaljub brought Plaintiff's gesture to their attention.  In other words, it is not as if Plaintiff's supervisors got together to brainstorm ways of terminating her.  Moreover, Powenski had little, if any relevant interaction with Plaintiff before sending her home on May 31, 2017, after the incident, and Plaintiff admits that she does not believe Powenski treated her differently because of her sex.  Powenski's involvement in the termination decision as a relative outsider makes the decision even less subject to question.  Finally, there is no evidence that Orders and Powenski had any doubts as to the truth of Rojas-Chaljub's report.

With regard to an invidious discriminatory motive, a plaintiff may make this showing with evidence that the employer has "previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class."  *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998).  As we concluded in our earlier discussion regarding the various adverse employment actions alleged by Plaintiff, we do not see any evidence of discriminatory conduct.  Accordingly, Plaintiff cannot show an invidious discriminatory motive on the basis of actions that predate her termination. Plaintiff alleges that multiple former female employees were also subject to sex discrimination, but upon review of her testimony, we are unable to ascertain any specific examples of discrimination.  (*See generally* Pl. Dep. at 43-56.)  To the contrary, when asked to explain how

18

those former employees were mistreated, Plaintiff gave conclusory responses, such as "For being a female," "Susan had discriminated against her as well for being a female," and "[she] had the same treatment from [DeSantis]." (*See id*. at 47-49.)  The record, including Tse's complaints about DeSantis, shows that DeSantis was difficult to work for and may have mistreated employees, but there is insufficient evidence to create a genuine issue of fact as to whether she discriminated against employees on the basis of sex or any other protected class.  Finally, Plaintiff cannot show that similarly situated male employees were treated more favorably. Indeed, there is no evidence that any other BrightView employees gave one of their colleagues the middle finger and, as Plaintiff admits, she is not aware of any.  (*See id*. at 43.)

As she made clear at her deposition, Plaintiff's claims rely heavily on her own personal beliefs and views about the reasons for her termination.  However, Plaintiff's "own personal belief that the true reason for the discharge was [] discrimination is … insufficient to create a genuine issue of material fact."  *Ade v. KidsPeace Corp.*, 401 F. App'x 697, 703 (3d Cir. 2010). Because Plaintiff has failed to meet her burden of establishing pretext, her discrimination claim will be dismissed.

### D.      Plaintiff's Retaliation Claim Will Be Dismissed

Plaintiff's Title VII retaliation claim is subject to the same burden-shifting framework as her discrimination claim.  To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must tender evidence that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'"  *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala College*, 51 F.3d 383, 386 (3d Cir. 1995)).  "If the employee establishes this *prima facie* case of retaliation

… 'the burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its conduct and, if it does so, 'the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'"  *Id.* at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)).

    For purposes of this Motion, Defendants concede the *prima facie* case insofar as Plaintiff engaged in protected activity when she reported DeSantis, and was subject to adverse employment action when she was terminated.[5]  Defendants then assert that Plaintiff's hand gesture was a legitimate, non-retaliatory reason for her termination, thus meeting their burden of production on the second step of the analysis.  We therefore must consider whether Plaintiff has raised a genuine issue of fact as to whether retaliation for Plaintiff's reporting activities was the real reason for her termination.

    To meet her burden on this last prong of the burden-shifting framework, Plaintiff must "demonstrate 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' from which a reasonable juror could conclude that the Defendants' explanation is 'unworthy of credence, and hence infer that the employer did not act for the asserted [non-retaliatory]

---

[5]    Defendants suggest that Plaintiff also views the allegedly inadequate investigation into DeSantis as a form of retaliatory adverse employment action.  Although we previously concluded that the investigation—or alleged lack thereof—did not constitute adverse employment action in the discrimination context, "[i]n the retaliation context, the definition of an adverse employment action is … broader because it 'is not limited to discriminatory actions that affect the terms and conditions of employment.'"  *Mathis v. Christian Heating & Air Conditioning, Inc.*, 158 F. Supp. 3d 317, 334-35 (E.D. Pa. 2016) (quoting *Burlington Northern*, 548 U.S. at 64).  Despite this distinction, our earlier analysis of the issue also applies to Plaintiff's retaliation claim.  Indeed, much of the case law to which we cite in support of our earlier conclusion actually addresses retaliation claims.  *See Kuhn*, 63 F. Supp. 3d at 803-04; *Scott*, 918 F. Supp. 2d at 356; *Clemmer*, 2008 WL 5100859, at *14-15.  Accordingly, we conclude that the allegedly inadequate

reasons.'" *Carvalho-Grevious*, 851 F.3d at 262 (quoting *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 199 (3d Cir. 2015)).  "Pretext is not established by evidence showing that [] 'the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'"  *Strozyk v. Phoenixville Hosp.*, 357 F. Supp. 3d 485, 495 (E.D. Pa. 2019) (quoting *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005)).  "Proving pretext 'places a difficult burden on the plaintiff.'"  *Id*. at 496 (quoting *Fuentes*, 32 F.3d at 765).

The evidence in this case precludes an inference of retaliation.  Plaintiff was terminated the day that she gave Orders the middle finger.  Just as close temporal proximity between a protected activity and adverse employment action may raise an inference of retaliatory animus, *see Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997), so too may close temporal proximity between a prohibited activity and adverse employment action demonstrate a sincere employment decision.  Moreover, Powenski, who did not have any previous, relevant involvement with Plaintiff or DeSantis, agreed with the decision to terminate Plaintiff.  *Cf. Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002) (holding that termination "after a decision, based on substantial evidence, of an undisputedly independent, neutral, and unbiased adjudicator that had the power to prevent the termination" is "highly probative of the absence of discriminatory intent in that termination").  Plaintiff's personal assessment of her situation, including her skepticism of Defendants' investigation, simply does not "throw[] enough doubt on [Defendants' explanation] so that a rational factfinder could reject it."  *See Fuentes*, 32 F.3d at 766.

---

investigation does not constitute an adverse employment action for purposes of the retaliation claim.

Because Plaintiff has failed to meet her burden of establishing pretext, her retaliation claim will be dismissed.

### III.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted. An appropriate order follows.

**BY THE COURT:**


**/s/ R. Barclay Surrick**
**R. BARCLAY SURRICK, J.**